# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

THE PREMISES LOCATED AT ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, CAMDEN WYOMING, DE 19934 DESCRIBED IN ATTACHMENT A-1 (TARGET PREMISES)

)
)
)
)
)
)

Case No.  24-344M

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344 | Financial Institution Fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John J. Honan, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date:  __October 8, 2024__

_____
*Judge's signature*

City and state:  __Wilmington, DE__

Hon. Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>(A) THE TARGET PREMISES LOCATED AT ███████████████, CAMDEN WYOMING, DE 19934; (B) AN IPHONE BEARING IMEI 351646275766769 UTILIZING PHONE NUMBER ██████-9014, AND (C) AN IPHONE UTILIZING PHONE NUMBER ████████-3088 | Case No.<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT APPLICATION

I, John Honan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application UNDER Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (1) the premises known as ███████████, Camden Wyoming, DE 19934, further described in Attachment A-1 ("**Target Premises**"), for the items described in Attachment B-1, and (2) an iPhone bearing IMEI 351646275766769, utilizing phone number ████████-9014, described further in Attachment A-2 ("**Subject Phone 1**") and (3) an iPhone utilizing phone number ████████3088, described further in Attachment A-3 ("**Subject Phone 2**") for the things described in Attachment B-2.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since July 2022. I have been involved in numerous investigations involving narcotics trafficking, firearms trafficking, and other violent crimes. I also have worked on investigations that have involved locating individuals using electronic devices, such as cellular telephones, and collecting digital forensic evidence.

3. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and/or information obtained from other agents and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1344, (bank fraud) and 1028A (aggravated identity theft) (together, "the Subject Offenses") have been committed, by Gheorghe NISTOR and Radu-Lucian GRIGORAS.  There is also probable cause to search the information described in Attachments A-1, A-2, and A-3 for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachments B-1 and B-2.

## **PROBABLE CAUSE**

### **A.  Indictment of NISTOR and GRIGORAS**

5.  On October 2, 2024, a federal grand jury in the Northern District of New York returned an indictment charging RADU-LUCIAN GRIGORAS, aka "Milan Kulhanek," and GHEORGHE NISTOR each with two counts of financial institution fraud, in violation of 18 U.S.C. § 1344, and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). That indictment, case number 5:24-CR-409 (DNH), is currently under seal. Arrest warrants were issued for GRIGORAS and NISTOR the same day.

6.  More specifically, the indictment charges NISTOR and GRIGORAS with knowingly participating in a scheme and artifice to defraud a financial institution. It alleges that in furtherance of the scheme, GRIGORAS and NISTOR installed skimming devices and pinhole cameras on ATMs at financial institutions to surreptitiously record the information encoded on customer's bank cards when they attempted an ATM transaction. GRIGORAS and NISTOR then caused that stolen information to be encoded on other cards, which they used to conduct fraudulent ATM withdrawals. The indictment alleges that GRIGORAS and NISTOR traveled to financial

institutions in various states, including Kansas, Missouri, New York, and Pennsylvania, to execute the scheme to defraud, and rented vehicles to do so.

**B.  Background on Skimming Devices**

7.  Based on my training and experience, the knowledge of other law enforcement officers, and publicly available sources, I know the following. "Skimming" is a term used to describe the theft of credit and debit card information using a device surreptitiously installed at a point of sale. The device is constructed to appear as if it is a legitimate component of a credit-card slot incorporated into point-of-sale terminals, gas station pumps, ATMs, and other locations where credit and debit cards are accepted. The customer unwittingly inserts his or her card into the skimming device rather than directly into the terminal's card slot. The skimming device collects the information from the card, which can include the complete credit card number, expiration date, and other associated information. Some skimming devices are also equipped with small cameras, which, if properly positioned, can observe and record the PIN entered by a user on the keypad.

8.  Criminals use skimming devices to steal credit/debit card information to use themselves for fraudulent purchases and transactions. The method of retrieving the stolen information from the device depends on the device's technology. Some skimming devices have Bluetooth capability, which allows the device to transmit the stolen information to another Bluetooth-capable device (such as a smartphone or computer) within range. Without Bluetooth capability, the criminal users must later retrieve the skimming devices and download the data by other means, including for example, through a wired connection.

**C.  Skimming Devices Installed at Credit Union ATMs in NDNY**

9.  In or around May 2024, the New York State Police (NYSP) began investigating complaints related to the installation of credit card skimming devices at the Northern Credit Union

(NCU) located in Evan Mills, NY. NCU personnel advised that they had reviewed security videos of the area surrounding the ATM at the Evan Mills branch. That video showed that on or about the dates of May 31, 2024, and June 9, 2024, an individual appeared to be manipulating the ATM in a manner consistent with the installation of a device on the card slot of the ATM.

10. NYSP reviewed the security footage from NCU of the suspects. NYSP reviewed the footage and observed that the actions taken by the two suspects appeared consistent with the actions necessary to install a credit card skimming device on an ATM. For example, their activity was focused on the card slot, and they did not appear to insert any currency or withdraw any currency. NYSP captured still images of the suspects and provided them to the Federal Bureau of Investigation. Suspect A appeared to be a male wearing a green baseball hat, an Adidas tracksuit, and a medical mask (see image below).



11.     Suspect B appeared to be a male with dark hair wearing a medical mask with distinctive tattoos on the back of both of his hands (see images below).

 

**D.      Arrest of NISTOR and Detention of GRIGORAS in Cicero, NY (June 2024)**

12.     On or about June 13, 2024, members of the Cicero Police Department (CPD) responded to AmeriCU Federal Credit Union (AFCU) located at ▮▮▮▮▮▮ Cicero, NY in response to a complaint related to the placement of a credit card skimming device on an automated teller machine (ATM). As described in more detail below, (i) the suspects installed a skimming device at AFCU on June 11, 2024; (ii) AFCU personnel discovered the device on June 13, 2024, removed it, and contacted authorities; (iii) law enforcement surveilled the affected ATM on the evening of June 13, 2024, and observed the suspects as they came back to retrieve the skimming device and the stolen data it contained.

13.     Members of CPD were provided with video surveillance footage by an AFCU employee. This footage was recorded on or about June 11, 2024, at approximately 9:24 p.m. The footage, which I have reviewed, shows a male wearing an Adidas track suit, a green hat, and a medical mask run up to the machine holding a device similar in shape and size to the skimming device that was subsequently removed from the machine, as described further below. In the video, the male is holding what appears to be a chisel with a wooden handle:



14.     This individual spent approximately three minutes manipulating the machine. This person does not appear to withdraw money from the machine at any time during this interaction. Based on my training and experience, and the training and experience of other investigators, and information provided by AFCU, the actions taken by this individual are consistent with the steps that are typically taken to install a credit card skimming device on an ATM.

15.     The machine was analyzed by AFCU staff and a suspected credit card skimming device was removed from the affected ATM and provided to CPD. The skimming device was comprised of two separate components. Later that day, following the removal of the device, members of CPD conducted surveillance on the AFCU in Cicero, NY.  At approximately 9:13 PM on June 13, 2024, members of CPD observed a white male in an Adidas track suit and green hat approach the ATM on foot and proceed to manipulate the ATM (image below). The apparel (hat and tracksuit) and the man's build and facial hair appeared identical to the man observed on the AFCU security video from June 11, 2024.



16.     This individual then left AFCU property and walked to a gas station across the street.  Members of CPD approached this individual and requested identification.  This individual provided the law enforcement officers with a Romanian Identification card, which indicated that he was Gheorghe NISTOR with a date of birth of ███████, 1982. NISTOR was taken into custody by CPD and a white iPhone was taken from his person.

17.     During this interaction, an additional officer was traveling to the area of the AFCU to assist the responding officers. This officer observed a white male wearing "heavy clothing" running from the direction of NISTOR.  After the officer drove past the running male, he was alerted that NISTOR was in custody.  The officer then patrolled back out to the roadway and observed the other male still running down the road. The responding officer caught up to the running male and asked this individual where he was coming from to which the male responded, "Romania."  This male was identified via Romanian passport as Radu-Lucian GRIGORAS with date of birth ███████ 1979. GRIGORAS was taken into custody and a gray iPhone was taken from his person.  GRIGORAS had distinctive tattoos on the back of both of his hands. These tattoos are captured below:



18.     AFCU staff continued to review the June 13, 2024, security video and they noted that directly after walking away from the ATM, minutes prior to his arrest, NISTOR discarded items on AFCU property after visiting the affected ATM.  AFCU staff provided this information to the CPD. CPD officers searched that area and recovered a small chisel with a wooden handle. In addition, a rubber glove was also recovered in the area, which appeared to be similar to a rubber glove that NISTOR was wearing in AFCU footage surveillance footage.

19.     AFCU personnel reported that recently, AFCU received disputes from its customers in the Central New York area for transactions totaling approximately $50,200. Based on my training and experience, knowledge of the investigation, and conversations with AFCU personnel, I believe that the suspects installed the credit card skimming device, and/or other similar devices on ATMs at other AFCU locations in the area, and that the stolen information contained on them was used to create new debit cards and PINs.  Following the creation of these new cards, the suspects fraudulently withdrew funds from victim accounts. AFCU indicated that the actual loss is likely much higher than the amount above because their number only records what customers have disputed to date at one location.  Based on my training and experience, the theft of this information could have been made possible by a credit card skimming device.

20.     During the investigation, I interviewed Victim T.S., an employee of AFCU's Fayetteville location. T.S. advised that on May 31, 2024, customers complained about the exterior ATM malfunctioning. In response, T.S. inserted his own debit card and found that he was able to use the ATM to check his balance. Later, on or about June 9, 2024, a fraudulent withdrawal was made from T.S.'s account using the AFCU Fayetteville ATM. I reviewed security video from that location and observed the following: (1) in the early morning of May 31, 2024, two individuals I recognized and believed to be NISTOR and GRIGORAS manipulate the ATM. Based on my training and experience and the conduct that occurred at the Cicero AFCU location, I believe that they installed a skimming device; (2) later that day, T.S. inserted his card into that ATM; and (3) on or about June 9, 2024, an individual who I recognized as GRIGORAS based on the distinctive hand tattoo and physical size, conducted a series of withdrawals from the ATM. Based on information provided by AFCU, the withdrawal from T.S.'s account occurred during this June 9th event. T.S. advised that he did not authorize anyone to make that withdrawal.

21.     I also interviewed victim T.M., who is an employee of another AFCU branch. T.M. advised that on or about June 3, 2024, she used the ATM at the AFCU Camillus location. I reviewed security video from AFCU Camillus that recorded this transaction. According to financial records, a withdrawal was made from T.M.'s account on or about June 8, 2024. T.M. advised that she did not authorize that withdrawal. I reviewed AFCU Camillus security video from the surrounding days and observed: (1) at approximately 10:00 p.m. on May 31, 2024, individuals I recognized as NISTOR and GRIGORAS appeared to install a skimming device on the exterior ATM; (2) on June 3, 2024, T.M. used the ATM to make a transaction; (3) on June 5, 2024 at approximately 5:20 a.m., a person I recognized as NISTOR removed a device from the ATM; and (4) on June 8, 2024, individuals I recognized as NISTOR and GRIGORAS returned to the ATM and appeared to use the ATM to make withdrawals.

**E.     Skimming Devices Installed at Credit Union ATMs Outside of NDNY**

22.     During the investigation, I obtained information from credit unions in Missouri and Kansas, which reported several fraudulent withdrawals had occurred in April 2024. I reviewed security video obtained from the victim credit unions and recognized the individuals conducting the transactions as NISTOR and GRIGORAS.

23.     During August 2024, GRIGORAS and NISTOR were captured on security camera conducting what appears to be the same credit card skimming activity at several banks in Pennsylvania.  One of these banks was TruMark Financial Credit Union located in Springfield, PA.  On August 1, 2024, footage which I have reviewed showed a man I recognized to be NISTOR approaching a TruMark ATM to place what appears to be a pinhole camera above the ATM keypad, as depicted below.



24.      I reviewed security video recorded at the Springfield TruMark Financial Credit Union on August 3, 2024. That showed a man I recognized as Radu Lucian GRIGORAS enter the credit union and use his fingers to feel for the pinhole camera (image labeled "A" below). GRIGORAS then exited the bank vestibule without completing a transaction. Immediately after GRIGORAS exited the bank, a man I recognized as NISTOR entered the TruMark vestibule, removed the pinhole camera with a screwdriver, and appeared to remove something from the area of the ATM credit card reader (image labeled "B" below).

25.      GRIGORAS and NISTOR visited interior and exterior TruMark ATMs from August 1, 2024, to August 9, 2024.  On August 7, 2024, NISTOR manipulated an exterior TruMark ATM without wearing a face covering (image labeled "C" below).







26.     NISTOR and GRIGORAS have been captured on bank security footage at numerous financial institutions conducting similar activity.  Your affiant has reviewed video footage from numerous financial institutions located in New York, Pennsylvania, Kansas, and

Missouri and was able to positively identify the actors as NISTOR and GRIGORAS in each instance where video footage was provided. This activity occurred from April 2024 to August 2024.

27. To date, the known victim credit unions have reported a loss of approximately $175,000 stemming from incidents involving NISTOR and GRIGORAS. I expect that amount to grow as the investigation continues.

**F.    Use of Cellular Phones During the Offense**

28. Following NISTOR's arrest in June 2024, CPD obtained a search warrant for NISTOR's cell phone. Upon execution of that court-authorized search warrant, law enforcement observed evidence of the Subject Offenses, including:

    a.  lists of banks including but not limited to the effected AFCU branches;

    b.  photographs of large amounts of United States currency and videos of credit card skimming devices connected to a laptop;

    c.  location information from the navigation app Waze, which showed that NISTOR had used the app to search for directions to many of the victim financial institutions in Kansas, Missouri, and New York; and

    d.  communications sent through encrypted messaging apps that were relevant to the investigation.

**G.    Subject Phones 1 and 2**

29. On August 15, 2024, Apple responded to a subpoena for information related to Apple accounts registered to ███████@gmail.com. Apple provided that on June 14, 2024— one day after CPD seized the previous phone from NISTOR—the Apple account registered to ███████@gmail.com registered a White iPhone 15 Pro Max, bearing IMEI

351646275766769, and phone number ████-9014 (**Subject Phone 1**). This account was registered to "Johnny Nistor", of ████████, Shirley, New York.

30.     Law enforcement databases have indicated that **Subject Phone 1** is registered to Gheorghe Nistor, of ████████, Shirley, NY.

31.     According to records obtained from the NY DMV, NISTOR and GRIGORAS each obtained a NY driver's permit in June 2024. Each permit lists the address ████████, Shirley, New York. Based on records provided by Airbnb, this location is not the permanent residence of NISTOR and GRIGORAS but was a temporary rental.

32.     On August 27, 2024, a court-issued order authorizing use of a pen-register/trap-and-trace device was served to T-Mobile for **Subject Phone 1**. Information provided by T-Mobile showed that this number is currently active and is connected to the phone bearing IMEI 351646275766769.

33.     A review of the incoming and outgoing calls for **Subject Phone 1** revealed that this phone number had approximately five phone calls with ████████3088 (**Subject Phone 2**) during the period of September 9, 2024 to September 22, 2024. These calls ranged from several seconds to seven minutes in duration and it was noted that this number was one of the most frequently contacted numbers by **Subject Phone 1**.

34.     An open-source search for  **Subject Phone 2** revealed that the number was listed as the phone number for a car rental business, "GRL Luxury – Cars Dealer Auto," with a business address of ████████████. New York, NY 10014, and a website, grlluxurycars.com. An open-source search of the street address revealed that this address was a  mailbox rental business.

35.     I reviewed the grlluxurycars.com website. Based on that review, and my training and experience, I believe that GRL Luxury is not a legitimate auto dealership or rental agency. I utilized whois.com, which is a service that allows users to look up the contact information of the person or company who registered a domain name. This search revealed that grlluxurycars.com was a domain that was registered by "Grigoras Radu Lucian" on August 1, 2024.

36.     On or about October 4, 2024, the Honorable Thérèse Wiley Dancks, U.S. Magistrate Judge for the Northern District of New York, authorized search warrants to obtain location data associated with **Subject Phone 1** and **Subject Phone 2**.

**H.     NISTOR and GRIGORAS Use the Subject Vehicle**

37.     In June 2024, a search was performed in a law enforcement database for GRIGORAS's law enforcement interactions. This search revealed that GRIGORAS was encountered by police while operating a white Porsche Cayenne with California registration 8LZW834 (the Subject Vehicle). That vehicle was queried in law enforcement databases and it was revealed that this vehicle received a traffic ticket in Solvay, New York, during the time period that GRIGORAS and NISTOR were conducting bank fraud in that area, as described above.

38.     Law enforcement reviewed data captured by License Plate Readers in the areas surrounding the financial institutions in Pennsylvania that were victimized by GRIGORAS and NISTOR in August 2024. These plate readers captured the Subject Vehicle during the same time frame in which GRIGORAS and NISTOR were captured on Pennsylvania ATM camera footage.

**I.     Arrests of NISTOR and GRIGORAS at the Target Premises**

39.     On October 4, 2024, law enforcement began receiving location information for **Subject Phone 1** and **Subject Phone 2** pursuant to the court-authorized search warrant. These pings indicated that both devices were traveling together and in Delaware. On October 7, 2024,

these phones were located in the area of Camden Wyoming, Delaware and appeared to remain for an extended period in a suburban area. Law enforcement conducted surveillance in the area where the cell phones were pinging and observed the Subject Vehicle parked in the driveway of █ ███████████, Camden Wyoming, Delaware 19934.

40.     On October 7, 2024, following the observation of the Subject Vehicle in the driveway of the **Target Premises**, law enforcement officers established surveillance of the residence. At approximately 7:20 PM, two individuals who matched the physical characteristics of NISTOR and GRIGORAS exited the residence and entered the Subject Vehicle. At that point, law enforcement approached and arrested the two men, who identified themselves as Gheorghe NISTOR and Radu-Lucian GRIGORAS, respectively. A third individual, Female A, an associate of NISTOR, was also present.

41.     During the arrest, law enforcement seized **Subject Phone 1** and **Subject Phone 2** from NISTOR and GRIGORAS. More specifically, NISTOR and GRIGORAS each had a cell phone on his person. These phones were seized by law enforcement and placed in airplane mode. Shortly thereafter, I observed that the location information that was being collected pursuant to the court-authorized search warrants ceased. Based on my training and experience, when a phone is placed in airplane mode the carrier is no longer able to locate the phone.

42.     According to records provided by Airbnb, an account in the name of Radu-Lucian GRIGORAS made reservations at properties located near credit unions around the time that fraudulent skimming activity occurred. This includes a 12-night stay in Solvay, NY beginning May 30, 2024, a 30-night stay in Shirley, NY, beginning April 30, 2024, and a 31-night stay in Kansas City, MO, beginning March 19, 2024.

43.     I believe there is probable cause that the **Target Premises** will contain evidence, fruits, and instrumentalities of the Subject Offenses based on the following. First, as described above, NISTOR and GRIGORAS have been observed on ATM security videos at financial institutions in multiple different states over the past approximately six months. The records provided by Airbnb demonstrate that they have a history of moving from one temporary housing situation to another over that period. Additionally, NISTOR and GRIGORAS have been observed in vehicles that were also rented. Finally, the bank security videos obtained from the victim financial institutions show that at different times, NISTOR and GRIGORAS were wearing the same clothing as they had been observed wearing on other occasions. For those reasons, and based on my training and experience, I believe that the **Target Premises** are the current residence of NISTOR and GRIGORAS, and that they are traveling with their belongings and tools used to execute the fraud scheme, and therefore, there is probable cause that items of evidence will be located in the **Target Premises**.

44.     Similarly, I believe that there is probable cause that a laptop used to facilitate and execute the Subject Offenses will be found in the **Target Premises**. As discussed *supra* at ¶ 28(b), a search of NISTOR's prior phone yielded a video showing what I recognize to be a skimming device connected to a laptop computer. The video appeared to have been filmed by the individual using that setup. Based on my training and experience, and the training and experience of other law enforcement officers who have investigating skimming fraud schemes, I know that laptop computers are used in furtherance of the scheme to, among other things, download the stolen debit card data from the skimming devices, and videos from the pinhole cameras, which show the customers entering their PINs into the ATMs, and also use peripheral devices plugged into the laptop to reencode the magnetic stripe of debit, credit, and gift cards. Furthermore, as discussed

above, NISTOR and GRIGORAS travel frequently, and I know based on my training and experience that laptop computers are more portable than desktop computers and therefore they are more likely to use laptops for the purposes described in this paragraph.

## SEARCH PROCEDURES

45.     With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonable practicable.

46.     If the government identifies any seized communication that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

47.     As described above and in Attachment B-1, this application seeks permission to search for records that might be found in the **Target Premises**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

48.    *Probable Cause*. I submit that if a computer or storage medium is found in the **Target Premises**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, computer storage media—in particular, a computers' internal hard drives—contain electronic evidence of how a 44 computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

49. *Forensic Evidence*. As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Premises** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and antivirus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.

For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer

and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

50.    *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine

storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

51. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRICS

52.     The warrants I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the searches. The passcode or password that would unlock the device(s) subject to search under these warrants is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the searches authorized by these warrants.

f. I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Target Premises

and reasonably believed by law enforcement to be a user 53 of the device(s), which are found either in the subject's hand or within their reach to unlock the device using biometric features in the same manner as discussed above.

h. h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to these warrants and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Target premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that any individual state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask any individual to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION**

53.    Based on the information provided in this affidavit, I respectfully request that the attached warrant be issued authorizing the search of: (1) the **Target Premises** for the items described in Attachment B-1; and (2) An iPhone bearing IMEI 351646275766769, utilizing phone

28

number ███████9014, and (3) An iPhone utilizing phone number ██████3088 for the items

described in Attachment B-2.

Respectfully submitted,

John Joseph Honan
Special Agent
Federal Bureau of Investigation

Sworn to me over the telephone and signed by me
pursuant to Fed. R. Crim. P. 4.1 on this __**8th**__ day
of October, 2024:

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

<u>**ATTACHMENT A-1**</u>

The property to be search is ████████████████, Camden Wyoming, Delaware 19934 (the **Target Premises**), which is a townhouse.  The **Target Premises** appears to be a two-story home. The house has gray siding and white trim. The house number ███" is clearly marked above the front door. An image of the **Target Premises** is below:



## <u>ATTACHMENT A-2</u>

An iPhone bearing IMEI 351646275766769, utilizing phone number ███████-9014, currently in the custody of FBI Baltimore Division.

## __ATTACHMENT A-3__

An iPhone, utilizing phone number ███████-3088, currently in the custody of FBI

Baltimore Division.

## **ATTACHMENT B-1**

*Property to be seized*

1.      All records and items constituting fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1344, (bank fraud) and 1028A (aggravated identity theft) (the Subject Offenses) involving RADU-LUCIAN GRIGORAS and GHEORGHE NISTOR, including:

      a.      Clothing worn during the commission of the subject offenses;

      b.      U.S. currency;

      c.      Electronic equipment, including computers, used to retrieve information stored on debit or credit cards, including skimming devices, pinhole cameras, computers, and connecting cords;

      d.      Electronic equipment, including computers, used to re-encode information on the magnetic stripe of debit or credit cards;

      e.      Tools used for installation and removal of skimming devices from ATMs;

      f.      Debit cards, credit cards, gift cards, and other cards containing a magnetic stripe;

      g.      ATM receipts;

      h.      Maps showing the location of financial institutions and/or ATMs;

      i.      Addresses of financial institutions;

      j.      Records of financial transactions, including ATM withdrawals and wire transfers;

      k.      Records and information showing the location of GRIGORAS and NISTOR;

      l.      Records and information related to the rental agreement for the **Target Premises**, and other past rental properties;

      m.      Records and information related to Milan Kulhanek; and

n.      Records and information related to the use and/or rental of vehicles.

2.      Computers or storage media used as a means to commit the violations described above, including financial institution fraud in violation of 18 U.S.C. § 1344 and aggravated identity theft in violation of 18 U.S.C. § 1028A, including computers and storage media used to obtain, record, store, and transfer (a) information contained on the magnetic stripe of credit/debit cards and (b) video recorded by pinhole camera of individuals using ATMs.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

4

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>**ATTACHMENT B-2**</u>

*Property to be seized*

1.      All records on **Subject Phone 1**, described in Attachment A-2, and **Subject Phone 2**, described in Attachment A-3, that relate to violations of Title 18, United States Code, Sections 1344, (bank fraud) and 1028A (aggravated identity theft) (the Subject Offenses) involving RADU-LUCIAN GRIGORAS and GHEORGHE NISTOR, from approximately April 2024 to the present, including:

a.      Records and information related to the location of financial institutions and/or ATMs;

b.      Any information recording the schedule or travel of GRIGORAS and/or NISTOR from April 1, 2024 to the present;

c.      Records and information of financial transactions, including ATM withdrawals and wire transfers;

d.      Records and information pertaining to skimming devices and components, including apps intended to be used with such devices;

e.      Records and information related to lodging reservations, including at hotels, motels, inns, and Airbnb properties;

f.      Records and information related to Milan Kulhanek; and

g.      Records and information related to rental vehicles;

h.      Communications pertaining to ATM skimming activity, travel, identification of financial institutions, rental vehicles, rental properties, and the spending of proceeds;

i.      Records and information related to cash expenditures; and

j.      Evidence of user attribution showing who used or owned **Subject Phones 1 and 2** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.